We'll hear first from Ms. White. Good morning, Your Honors. My name is Kelsey White and I represent Vertex. May it please the Court. As a result of the District Court's misapplication of Texas law on repudiation, Penthol got out of its five-year contract with Vertex a year early, without any contractual basis for doing so and without paying benefit of the bargain damages for its choice. We're asking the Court to reverse and remand for a partial retrial on the benefit of the bargain damages and the alternative, at minimum, reverse and remand for determination of our attorney's fees and costs under the agreement because we did recover judgment as a non-defaulting party against Penthol, a defaulting party. Subject to the Court's questions, I'll first discuss the repudiation issue and then I will discuss the fees and expenses under the agreement. At the outset, there was a disagreement in the briefing about the standard review for this first issue, repudiation, and I just point out to the Court that we relied on the United States Supreme Court's recent articulation of the standard review for mixed questions in Guerrero-Las Barrias, a recent case, and Penthol did not address that case in its response brief and instead argued that this is a fact question, it's de novo review. I don't think that what the Court faces is a fact question. As we explained in our reply brief, the exercise on repudiation is looking at a series of letters. There's no dispute about factually what those letters say. The District Court isn't making factual findings about, for example, a conversation where people are debating what the facts are. The District Court is just applying repudiation law to these letters. And so we submit that the proper standard review here is de novo. And I'm happy to discuss, I do think we can win on an abuse of discretion, clear error type standard as well, but I'll focus on de novo because we do contend that that's the proper standard review. And the District Court really made four errors in applying repudiation law and it's just the four reasons that it gave in its opinion. And the first one is, and this is a distinction that Penthall raises in its response brief as well, the idea that because this contract contained a notice and cure provision where upon a notice of default letter there are 30 days before the noticing party can terminate, that that somehow impacts the repudiation analysis. And it does not. And the reason for that is that under Texas law it's crystal clear that parties can repudiate by threatening not to perform in the future. So the fact that there's a period of time that's going to happen before Penthall is going to terminate the contract because it's making an extra contractual demand on Vertex, the fact that that's going to happen 30 business days from when the letter is sent does not affect whether or not that's a repudiation. And I think that the language of the contract supports this. So Section 7.2, it's limiting the noticing party's rights. It was limiting Penthall's right to take further action for 30 days. It was not limiting what Vertex could do. It was not changing Vertex's common law rights to accept a repudiation. The language doesn't speak at all about what Vertex's rights might be. And so Vertex had the right to accept repudiation. The procedure didn't change that. And in our briefing, and then also in the lower court, in the district court, we actually cited, and none of the Texas cases deal with this particular instance where you have a contract with a noticing cure provision. But in our brief and in the district court, we actually cited a district court case out of North Carolina, and that was Basic Medical Care Plus versus North Carolina Mutual Life Insurance. And it actually did deal with a noticing cure provision, and the court held that repudiation could still exist when a contract has a noticing cure provision. And so that is one case that has that feature, and it supports the argument we are making. But I think generally when you look at the Texas cases on this, the repudiation framework applies to any contractual obligation. So whether someone has promised to deliver you a car in 30 days, that obligation can be repudiated. So to hear the fact that we are being sent a default letter saying that unless we stop doing something we're allowed to do, the contract will be terminated in 30 days, the analysis should be the same. And Penfield doesn't cite anything, and the district court didn't either, that suggests there's some categorical rule that in the context of a notice and default provision, that somehow means background law and repudiation doesn't apply. There's no case that says that. In order to repudiate, the statement has to be absolute and unconditional, right? That's correct. And what they said is we think you've breached the contract. If you don't cure the breach within 30 days, we will terminate the contract. And you take that to be absolute? It is, and the reason for that is when the if, when the condition is imposing an extra contractual demand, that is a repudiation, and that's from the restatement and Texas law. So the if, the thing that's conditional, is the repudiating party demanding something that the contract does not allow. So, yes, the case is. What was that demand? The demand was that Vertex stop selling VTX6, which was a product we had been selling the entire time the parties had been in this relationship. They were saying for the first time, you can't sell that, it competes with our product. And the district court decided, and they haven't appealed, that that was incorrect. It did not compete. We've been selling it all along, throughout the opinion that their assertion was inaccurate, that there was no contractual basis for them to say that. So under the restatement in the Texas cases, they are imposing an extra contractual condition on future performance. They are now asking something of us. But it's extra contractual because their assertion was inaccurate. That's true. That's true. So why would your response be, you're wrong about that? It was. That was our wrong. That was our response, and that is something that under Texas law, on repudiation, the other party first can do. So the first thing the party can say is, urge that they retract it. You're wrong. That is not correct. You need to perform. You need to keep performing. We're not going to concede to your demand, and you need to keep performing. And that is what Vertex did on January 19th. And that's actually the second error the district court made. I understand all of those facts. I just don't know how that gets you to a determination that it's repudiation, that they repudiated. They made a mistake, and you pointed it out, and then you said, oh, but you repudiated the contract. Yes. So I would point the court to scientific machine versus flash parking because it's a similar situation where one party is telling the other, we're not going to do, we're changing the terms of the contract essentially. They are refusing to do something they were supposed to do. And the counterparty first writes back and says, whoa, whoa, whoa, you need to perform. What are you doing? And they're debating whether or not there's going to be a breach or not. And then when the reputing party does not back down, the other party accepts the repudiation, which is what we did on January 27th. But wasn't Vertex required to wait until the end of the 30-day period before claiming a repudiation occurred under scientific machine itself? It was not. And the reason for that is the distinction with what is the time of performance. So scientific machine didn't actually have a notice and cure period. There wasn't a deadline like we have. But the catch here, and this is another error that the district court made, the time of performance, what that is, is actually the end of the 30-day period, February 4th. At that time, Penthal was either going to perform, i.e., not terminate the contract, despite us continuing to sell VTX6, or it was going to terminate. That is the time when we were going to learn whether or not they were going to perform. And so under Texas law, we have to accept repudiation before that time. If we had waited, if we had done nothing, and waited until February 4th, this is how it would work under the Texas cases we cite, we would have to show up ready to perform on February 4th, and they would either perform, in which case everything is fine, or they would not perform, in which case they had just committed a regular breach then, and repudiation sort of goes out the window. So the problem with their argument that we had to wait until those 30 days is that it eliminates, under Texas law, our right to accept repudiation before the time of performance. They are forcing us to wait for the time of performance. And the Texas cases that both parties cite say over and over, we have two options. We could do that, or we could accept repudiation before we had to wait and find out whether or not they were going to perform. The SRMA gave PINFAL the right to decide whether to terminate or not, and that right could not be exercised until February 3rd, 2021. That is correct. The problem is that the default that they were asserting was wrong. It was extra-contractual. They were saying we had to do something. And this is the thing. The breach they were alleging was something we had been doing since we entered the contract. We had been selling VTX-6 the whole time. So they are saying the only way we, PINFAL, are going to keep performing this contract is if you stop doing something you have done since we entered the contract. And we could treat that as a repudiation under, you know, Hoglum, Baytown State Bank, the Texas cases that we have cited. I have an issue with the repudiation claim. And, you know, PINFAL had argued that it should have been stricken, and the district court addressed all of that, and you cited this case, ExxonMobil Global Services, and the district court quoted from that. Yes. And it appears that the language that was quoted from that does not actually appear in that case, but is instead in a case site, Thomson Reuters AI tool. So could you please . . . I'm not . . . it appears that way. So could you please address that within seven days, and the other side can address within seven days if that language is actually in that case or not? Yes. And just if I can understand Your Honor's question correctly, do you mean in the district court? Yes. Okay, because I was not . . . And then the district court cited it . . . Okay. . . . back to as part of the opinion, and it seems that that needs to be corrected, and someone needs to . . . and maybe that's wrong, and maybe . . . Your Honor, I will absolutely look into that. I'm unaware of that issue. But that's . . . obviously that's something that's happening quite a lot in courts around America right now. You see that in the legal news almost every other day that hallucinated things are being cited, and sometimes courts, unfortunately, are also picking up on them from the parties. So could you please address that in seven days, and also the other side has a chance to address that . . . Absolutely. Because we want to make sure that everything that's cited in this case that's being relied upon is correct. Absolutely. I'm unaware of that issue. I will look into that, though, and handle that. I'm happy to speak on that issue as well, on the merits of it. Okay. I would like to. That would be fine. Just briefly, I do think, you know, we're looking at the district court's exercise of its discretion here. Repudiation is simply a form of breach, so we don't agree that it needed to be specifically pleaded. The facts needed to be pleaded, and they certainly were, and I don't think Penthill has shown how it would have been harmed. The damages are the same. The factual discovery would be the same. And with the brief amount of time I have, I'll just turn to the second issue. Even if there were to be a mutual termination of the agreement, the agreement would still provide us our fees, and that's because the district court did find that we were the non—well, it said we were not the defaulting party, and Penthill was also not a defaulting party, but that was because the court was conflating termination, how the termination occurred with whether or not there had been a default. And as we argue in our brief, the language defaulting and non-defaulting is certainly different from terminating versus non-terminating. And there can be a situation where there could be a partial breach, and someone might owe someone damages, but at the same time the parties agree to mutually terminate. So you could have a default and a non-defaulting party, and then we all mutually agree to terminate, but there is a fight as to something, and the party that succeeds should be able to recover their fees. And interestingly, Penthill argued this themselves in the district court at—the record site is 4683. Penthill said, the facts here show that one party can be in default when both parties mutually agree to terminate the SRMA. I agree with that. Penthill now does not agree with that. So based on the plain language of the SRMA, and because we recovered damages, and we were not in default, and they were, we would ask the court to at least remand for the fees issue, which in total is about $3 million. So it is a substantive amount. The case was tried on many claims all the way through. Did Vertex ever dispute Penthill's February 4th letter, which said that Vertex and Penthill had mutually agreed that the agreement was terminated under Section 7.1D? We did not write a letter back to that. It was certainly disputed at trial, but we—at that point, Penthill had already written back on January 29th and said that the agreement was terminated, and that letter is actually when Penthill says, we haven't cured our defaults. So at that point in time, Penthill is saying, yes, it's terminated, but Vertex are still in the wrong. The February 4th letter is unprompted, and we did not respond to it. Okay. Should the documents in the record continue to be sealed or not? Your Honor, we do not think that they should be. We— You know, we often unseal documents that are sealed in the district court if there are no good reasons for them to be sealed. I'm sorry, I didn't— I said we often unseal documents from the district court if there's no good reason for them to be sealed. So I'm going to ask the opposing counsel as well the question. It doesn't seem why they should be sealed. I agree with Your Honor. Okay. Thank you. Good morning, Your Honors. May it please the Court, Bill Katz here on behalf of Penthill LLC, the appellee here. Your Honors, this Court should affirm the district court's decision in full. We had a five-day bench trial in front of a very experienced district court judge, Judge Hanen. He considered all the facts here. He weighed those facts. He found that there were fact issues. That's why he denied summary judgment, particularly on the competition issue. If you look at the record on page 4144, he found that fact issues abound. So we had a five-day bench trial. He made findings of fact. And all those findings of fact, none of them are clearly erroneous. Let me start where my colleague started with the standard review. We obviously disagree that Guerrero is controlling here. Guerrero specifically talked about addressing settled facts. And again, the facts here were not settled. That was the reason we had to have a five-day bench trial with multiple witnesses. I think Your Honors asked some of the earlier advocates for your best case. Let me say Bertucci. This Court's decision in Bertucci is our best case on the standard review. And let me explain briefly why. Bertucci makes it clear, and again, that was a bench trial, that if a finding is based on a mixed question of law and fact, that this Court should only reverse if the findings are based on a misunderstanding of the law or a clearly erroneous view of the facts. And again, the facts are not clearly erroneous. And what I would point out, Your Honor, the court here, the district court, did not misunderstand the law. If you look in the record, I think it's pages 6355 through 6357, the court clearly articulated the correct law on repudiation. Clearly understood what the law was on repudiation. On the fee issue, the court clearly understood what Texas law was on contract interpretation issues. The court clearly understood and articulated what the law was on the cost issue on Rule 54. So again, what Bertucci then says is as long as the district court's application of that law is plausible, then this court will not reverse, okay, even if this court were to think or reach a different conclusion than the district court did. So in other words, you all, if you were sitting in this district court, or if this court could consider and try this case, you might reach a different conclusion than the district court. But here, the district court understood the law, made findings of fact that are not clearly erroneous. The decision is entirely plausible and that there is no basis to reverse on any of the issues that Vertex presents. And so again, Bertucci is our best case on that issue. On that, the district court said that Penthall failed to perform certain contractual obligations and awarded Vertex over a million dollars for unpaid commissions and performance incentives. Isn't that true? Well, Your Honor, it is true that there were damages awarded for unpaid commissions for 2020. But I think with respect to the first part of your question, and I'm happy to recite you all the page citations in the record, I made a whole list of the findings the district court made, that both Penthall and Vertex were performing under the contract until January the 27th, that neither party considered the contract terminated as of January the 19th, the date Vertex sent us a letter, and that neither party considered Penthall's original December 18th, 2020 letter to be a repudiation. So I'm happy to go. I'm not talking about repudiation. I'm talking about the failure to pay the commissions, the 1.154127 amount. Right. Why isn't that a default? Can you help with that? I'm not asking about repudiation. Absolutely. I'm asking why isn't that a default. I apologize. I misunderstood your question. So that one is clear, Your Honor. So as we know, Texas is a freedom of contract state. This contract is drafted and applies Texas law. So here, the reason that the failure to pay those commissions is not a default is the contract makes it clear in Section 7.1B. So Article 7 of the contract addresses termination. And in 7.1B, the parties agreed that if there was a failure to pay any monies due under the contract, I believe it's 7.1B Romanet 1, so little i, that Vertex was obligated in order to make Penthall the defaulting party and Vertex the non-defaulting party, Vertex was obligated to send a written notice to Penthall and give Penthall ten business days to cure. I believe a non-payment issue under the contract, you get ten business days under the letter Penthall sent, you get 30 business days under 7.1B Romanet 2. So the issue here, there's no evidence in the record that Vertex ever gave that contractually required notice to Penthall and gave Penthall ten business days to cure. In fact, the evidence, as the District Court found, is directly to the contrary. Penthall first demanded payment of those monies in a letter sent on January 27th. And rather than giving Penthall ten business days to cure, again, as required under the contract, freedom of contract what the parties agreed to, Vertex said you need to pay us this money within two days and the contract is hereby terminated. So again, the contract says if a party hasn't paid, you send a written notice, you give them ten business days to cure. It could have been a default, but they didn't follow the procedures under the contract. So the contract? Correct. Well, it's not a default because they didn't follow the procedures. I mean, the fact— Facts gave rise to a condition that could be a default, but they didn't follow the contractual procedures to initiate a default under the contract. I think that's right. Could that have been a default? Yes, if we were in a counterfactual world where the world was different in the but-for world, but they didn't follow the contractually required provisions, which is part of the grounds why the court said, and I think also the court said, look, the focus of the trial, and the court makes it clear in its kind of post-judgment order, I think at page 69, 68, I think, of the record, when the court is making rulings on Vertex's later request for fees and our request to amend the judgment, the initial judgment. And the court said, look, the two key issues at trial were, did Vertex wrongfully compete in violation of the contract? And then secondly, did Penthall wrongfully terminate? And the court said that it was a split decision because Vertex prevailed on that first issue and we prevailed on the second issue. Vertex got a finding they didn't compete on a fact-intensive inquiry. We got a finding we didn't wrongfully terminate. So on the default issue there, again, the court found that the nonpayment did not arise to the level of default under the contract under the express language because Vertex didn't dot all I's and cross all T's, as it agreed to do under the contract. And then also the court denied additional fees also for the grounds that when it came to this prevailing party issue that I just touched on where the court said, you know, it was a split decision, and that the issue that Your Honor raised about these damages, these commissions, that was truly the tail wagging the dog. I think if you read the district court's decision post-judgment, the court said of the 37 or 39 pages in its findings of fact and conclusions of law, that discussion of the unpaid commissions took up exactly two pages. So, again, it is a very small component of what was at issue in the district court. I hope that does not answer your question, Your Honor. Okay. So let me, since we've talked a little bit about repudiation, just let me follow up on a couple of things that Judge Graves had asked my colleague here. So, and let me clarify the record. I think if you go back and look at the December 18, 2020 letter that Penthal sent, as the district court found, we believe we were following the contract. So, again, there's no absolute repudiation, right? This is like the best cases for us on absolute repudiation are the Davis case and the Kilgore case, right? So in the Davis case, the San Antonio Court of Appeals said there's no repudiation because the trust recognized the validity of the restrictive covenants at issue and tried to legally change them. Here, we recognize the validity of the contract because we sent a letter that tracked the contractual language, as the district court found. So we thought the contract was in place, and far from repudiating it, we sent a letter, although, as the district court said, it was mistaken, that we thought that they had engaged in a default. But to be clear, if you read that letter, we didn't tell them they had to stop selling VTX-6 totally. Okay? That's what my colleague got up here and said, that we told them something that was impossible under the contract. Not correct. We told them they needed to stop selling what the district court referred to as high VI or high viscosity index VTX-6. So all we said is, you can keep selling VTX-6, you just can't sell VTX-6 that qualifies as a Group 3 base oil because it has a viscosity index of 120 or higher. Okay? So this whole notion, their whole argument that we somehow asked them to do something not required by the contract is factually incorrect when you look at the language of the letters and as the district court found that our letter on December 18th was not a repudiation. So I think the other thing that I would point out, so again, Davis and Kilgore are the best cases on absolute repudiation because they both found that you had to render the other side's performance impossible, and that's actually, again, factually incorrect. The district court found that VTX and Penthal both continued to perform after the December 18th letter. Everyone continued to perform until VTX sent its termination letter on January the 27th. Certainly, if VTX truly believed there was a repudiation in the December 18th letter, they should have stopped at that time and not continued performing for over a month. Let me mention another thing on repudiation. This whole issue on the repudiation issue. So one of the best cases for us, again, is Gonzalez. That's a Fifth Circuit case out of 2004 cited by the district court. Gonzalez makes it clear that repudiation is a separate claim from breach of contract, and it has three essential elements. What are those elements? First, an absolute repudiation. Second, lack of a just excuse. Third, damages. And what this court said in Gonzalez also is that the burden of proof is on the party claiming repudiation. So, in other words, VTX has the burden to prove those three essential elements. And here, the district court found that at least the first two of those elements, absolute repudiation was absent, because, again, our letter tracked the language of the contract. We thought it was still in place. VTX continued to perform. We did not render their performance impossible. But also, this lack of a just excuse, the court found, again, that we were mistaken, that there was a just excuse. It was a fact-intensive inquiry as to whether VTX was competing, and it turned out we were wrong. But that doesn't mean that we lacked a just excuse when we were tracking the exact language of the contract and were acting in good faith. And on the mistake issue, the lack of a just excuse, best cases for us there is the Earl Hayes case. That's a Houston Court of Appeals case out of 1977. The Englehart case, that's the Eastland Court of Appeals from 1946. And then also, I would mention the Jenkins case, although they didn't find a mistake there. They found mistakes in the Earl Hayes case and the Englehart case and found no repudiation in Earl Hayes and Englehart because there was a mistake. But Jenkins, I'd also mention it's a Fort Worth Court of Appeals case out of 1999. So all those cases recognize that if you are under mistaken belief, either factually or legally, that that would support lack of repudiation. And again, the district court's factual findings here showed that we were mistaken. We believed that we were giving notice under the contract of a potential default, page 6356 of the record. We had a mistaken understanding about this high viscosity index VTX-6, page 6357 of the record. Vertex elected not to treat the December 18, 2020 letter as a breach, page 6357 of the record. The evidence shows Vertex didn't consider that letter to be terminated as of January, the contract to be terminated as of January the 19th, page 6357. So the court, again, here, there's two essential elements that Vertex must prove that the district court found facts, again, facts that did not satisfy those elements. And again, the court had a correct misunderstanding of the law. They can quibble about the application. But the fact is those findings by the district court are plausible, and this court should not reverse under Bertucci even if you might reach a different decision. Can you talk about the fees and the cost? Absolutely. Why isn't Vertex the prevailing party on at least one of its claims? Well, they're not a prevailing party, as the district court found. And again, that's, let me find the citation here. Okay. So they're not a prevailing party because of the fact that both parties were partially wrong and partially right. That's what the district court said on page 6968 of the record. And again, this is what I mentioned earlier. The district court noted there were two key issues at trial. Did Vertex compete in violation of the contract with Penthol? And secondly, did Penthol wrongfully terminate? And the court found split decision so that, again, Vertex prevailed on the first issue and got a finding they did not compete. Again, factually, that was a fact-intensive inquiry, as the court noted. Right, but they did prevail to get a million dollars worth of damages that you and I have already discussed here today. And so why didn't they prevail at least in part? And you might say they have to segregate their fees or something like that. But why didn't they qualify to get their fees on that tiny portion of the case as prevailing plaintiff parties under the law? Sorry, Your Honor. So the answer to that question is the district court looked at the facts here and looked at the claims here and looked at the different arguments and on balance said Vertex won on some issues, Penthol won on some issues. There's no prevailing party here. What case says that, that you can do that? I'm sorry. Sorry, go ahead. Well, I was going to ask about Section 7.2. Okay. A non-defaulting party versus a defaulting party. 7.2 entitles a non-defaulting party to reasonable expenses from a defaulting party. And the district court concluded that Penthol failed to perform certain contractual obligations, making you a defaulting party, at least in my view. So why wouldn't Vertex be entitled to fees? Great question. So first of all, to answer both these questions, you are all talking about two questions that go to this issue of fees, but they're kind of sub-issues. So the way I think about it, which I would suggest the way the court would think about it, obviously you guys will make the final decision on that, because I think if you read the district court's findings, the district court did two things. It looked at fees both under the language of the contract, under Judge Graves' question, which is, okay, is there a non-defaulting party? Is there a defaulting party that would support fees under 7.2? So that's a contractual issue. The other issue that Judge Altright is asking about is sort of this prevailing party issue, kind of more of a Chapter 38 issue. So I think let me start with the contractual part first and then come back. So on the contractual issue, again, it's similar to what we were talking about earlier. The only part of the contract that talks about default and non-default is Article 7. So the parties agree default is linked to termination. If you read 7.1b, 7.1b addresses how you allege a default and make someone a defaulting party. 7.1b says if a party has not paid money that's owed, you have to send them a written notice and put them on notice and give them 10 business days to cure. That is how you make them a defaulting party. And so as we talked about earlier, the reason Vertex, under the contract that parties agree to, cannot be a non-defaulting party and the reason Penthal cannot be a defaulting party is Vertex never sent their contractually required notice. In order to get fees under 7.2. So when the district court made a finding that Penthal failed to perform certain contractual obligations, it made that finding and then awarded Vertex a million dollars to unpaid commissions and performance incentives. That's not a determination that you're a defaulting party? No, not under this contract because, again, the parties. So we're basing that on what default means? Well, I'm basing it on the whole contract, Your Honor. The way the contract is structured in order to make someone a defaulting party, it's not done in a vacuum, right? So the parties here contractually provided that the way to make someone a defaulting party is you have to follow the language of the contract. So you had to follow 7.1 and put them on notice that they hadn't paid and you have to give them a chance to cure. That's how you make them a defaulting party. Here, the fact that we didn't pay means we have to pay them. You can be a defaulting party, but they're not made one until you label them so? Is that what you're saying? What I'm saying is a party can fail to comply with the defaulting party is a contractually defined term. What I'm saying is you can fail to comply with your contractual obligations and have to pay somebody money, but that doesn't necessarily make you a defaulting party under the language of this contract. The language of this contract says the way you make someone a defaulting party and get your fees and costs and all the other things that 7.2 allows you to get is you have to satisfy the threshold issue first, which is you have to give them the contractually required notice. If you don't give them the contractually required notice, they're not a defaulting party. Now, that means you can still get paid, as the district court said here, money that you're owed, but you don't get all the extra stuff like costs, fees, interest, and everything else that, again, you wouldn't be necessarily entitled to under the common law, okay, but that you get all these plus factors that the parties contracted for. So my answer to that issue, Your Honor, is the reason you can not comply and we would have to pay them a million bucks in unpaid commissions, but we don't have to pay them fees and why the district court correctly found that neither party was defaulting or non-defaulting is the parties didn't dot all I's and cross all T's under the contract. So that would be my answer to your question. And I'm out of time, so I have not been able to address the last part of Your Honor's question. Judge Allright, I don't know if you want me to do that. I have a question that's related. Are the fees that we're talking about different under the – would they be different under the contract or under Chapter 38 or is this the exact same amount of fees and is it a some certain or would we have to remand – I'm not foreshadowing. Under either theory, would we have to remand to the district court or is there an agreed amount of what the fees are in this case under either the contract or Chapter 38? No matter what – if you do anything other than affirm, you have to remand this case because of what Vertex is asking for and because, Your Honor, the answer to your question is there's no amount of fees that has been – There's not an affidavit that's agreed to? No, there's not. No – absolutely not. You would have to go back under either Chapter 38 or the contract if you don't prevail under either of those theories. Correct. That is correct. Or to determine what the appropriate amount of attorney's fees would be. That's right. Okay. Would cost trail? Yes. Automatically trail? If we were to find that either contract fees or 38 fees should have been awarded, not foreshadowing, would cost tag along and go back also? I think so just because, again, as I understood from Rule 54, it grants the district court pretty broad discretion. You would say go back and look at cost too because we're looking at it under one of these theories or both of them. Correct. If you're going to send it back, and again, don't think you should, but if you're going to send the fees back, then I agree you should send the cost back too and let the district court judge resolve all of that in one fell swoop. And I do feel a little guilty. You can have one minute to address Chapter 38, and you can also have one minute to address Chapter 38. Well, Your Honor, the short answer is I don't have a case sitting here. You asked me what case says that. I don't have a case sitting here other than, in my experience, obviously the determination as to whether a party is prevailing or not. Again, it's the district court's decision in the first instance, and here the district court, again, had reasons for it, clearly articulated those. I think if you look at page 69, 68 of the later order as well as the original findings and found, again, that the parties were partially right, partially wrong, and then on that basis there was no prevailing party. I don't have a case as I stand here right now for you. You know, I'd be happy if you wanted me to submit one in the seven days on the ExxonMobil case. We can do that too. But I think ultimately, again, under – I'm not asking for you to submit one. Okay. I think ultimately under Bertucci, the district court's findings as to who was right and who was wrong and how the parties behaved are all factual. Those should not be turned around. I think the last thing I would say, Your Honor, is I agree. At this point, since we are very far beyond the party's relationship, we would have no objection to anything in the record being unsealed at this point. So I thank you for your time. Thank you. We have your argument. On Chapter 38, Your Honor, we did not seek our fees under Chapter 38 because as it was drafted at the time the lawsuit had started, we couldn't under the LLC issue. Okay. So Chapter 38 isn't at issue. Which was changed in 2021. Right. Previous case. It was an older case, yes. So we didn't get the benefit of that, unfortunately. So that's not at issue here. So only under the contract? That's correct. And I'm just going to spend my rebuttal time on one brief point on the contract, on the fees. Counsel argued that the reason Penthal isn't a defaulting party is because we didn't send a notice of default. And what's happening there is, again, conflating termination with the post-termination rights under 7.2. So I think what's important is Section 7.1, which is the provision that talks about sending a notice of default in 7.1b, that is something you have to do if you want to terminate based on the default. So the section starts, this agreement is subject to termination as follows, and then there are four options. One of them is if you send a notice of default. So you have to do that if you want to use the default to terminate. That isn't what puts someone in a default. Because default isn't defined anywhere. It just has to be given its common meaning. So once there is a termination, whether it's by mutual agreement, whether it's because someone defaulted, then we go to Section 7.2, and that is the provision called termination rights that discusses fees and expenses. And it discusses defaulting party versus non-defaulting party. But nothing about 7.1's notice provision has to do with whether or not someone becomes a defaulting party. It's whether or not you can use that default to terminate. When we sent our letter asking for the amounts of commissions that they owed on January 27th, in our perspective, and in the district court's determination as well, the contract was already terminated. We were in Section 7.2 at that point. We were not in a position where we were trying to terminate them based on a default. We were terminating it based on accepting their repudiation, which the district court rejected. Okay, even if the district court rejected that, under Section 7.2, if they had defaulted, its plain meaning, and we had not defaulted, we're entitled to our fees. So I disagree with counsel's read that that notice procedure had to happen for a default to exist. That notice procedure had to happen for us to have terminated based on default. Based upon the default. Correct. So I don't think there's any way to read the contract and read the district court's finding that Penfall failed to comply with its contractual obligations and come to the conclusion that we aren't entitled to some of our fees. And I do agree that a remand is appropriate. We did tender our fees in an affidavit supporting our fees, but it's not agreed, and so the district court would need to find the reasonable and necessary fee. But unless the court has other questions, I'll just yield back the rest of my time. Thank you. We have your argument. Thank you.